May it please the Court, my name is Carl Faraday. I'm here today representing the estate of King Toguchi and his parents, Betty Elizabeth Toguchi and Hiro Toguchi. In this case, the Court's really asked to determine whether or not a doctor whose treatment decisions deprive this man of his life is going to be granted qualified immunity, as Judge King did, on the basis of her professed ignorance of his condition. I think that's a very serious question, because if that is the standard... Will your opponent say it's an accurately stated question? Probably not, Your Honor. That's what I'm thinking, too. How would you state it, Judge Harris? No, you are the appellant, so you state it, but I think if you want to win the appeal, you've got to state it so that the record supports your statement of the case, of the question. Well, I think I have, Your Honor, because I think the argument that was persuasive to Judge King below was this, that because this doctor did not believe what she was doing, put this man... You don't want me to state the record. The doctor says, I'll never prescribe that medication. I don't do it because I believe it's habit forming. Under no circumstances would I have prescribed it. Okay. Now, doesn't the record show that? That's true as to one of the several medications... You see, and the reason I want to let you make your argument is because I'd rather hear you make it, but when you ask me as if you question whether the basis of my question of you, I'm telling you the basis now of my question. I understand, Your Honor. All right. Thank you, Judge Harris. Yeah, the doctor said a lot of things about the treatment, and those really go to the second half of my argument, which deal with the material facts of this case and what they actually show. Why don't you tell us where you think the district court erred in this case? Okay, there are three points of error. The first point of error is applying the wrong standard of under-associated versus cats. Judge King applied a specific intent analysis to the qualified immunity provision and allowed the subjective testations of the doctor to carry the day, saying, I didn't believe I did anything wrong. That's not the test. The test is, was the standard clearly established so that a reasonable person would understand that what they're doing is in violation... Well, actually, the test isn't that any. The test is whether or not, taking the facts into light, most favorable to the point that there was a violation of a constitutional right. That's what we do first. That's the first... So we don't get to clearly established unless we find that there has been a constitutional violation. That is correct. All right. As Judge Noonan recently said in Wall v. Orange County, and you were on a panel in the Serrano case, which also involved a prisoner who was deprived of a wheelchair in a spinal unit. That is the first inquiry. And so the first point is, does this prisoner have a right to medical care that's protected by the Constitution? And since Estelle v. Gamble, the answer to that question is undoubtedly yes. Right. All right. Dr. Must... Well, the second question is, did the care in this case violate the constitutional standard that's been set? That's right. And that means, was he deprived of medical care that would address his serious medical needs? The question is, was she deliberately indifferent? Which is different than whether or not he was deprived of the care. The issue is, was the doctor deliberately indifferent to his medical condition? Which is a different question to whether he was deprived of the medical care. The question is, as you point out, did she know of circumstances or should she know of circumstances under the Redmond case that would demand that she make basic inquiries, baseline inquiries about this prisoner's condition, such as, what's his pulse? What's his heart rate? Is Redmond's should have known still the law of the circuit? I believe it is, Your Honor. Don't you get a negligence standard on your side of the court? Absolutely not. They should have known. No. If you should have known and don't know, that's your negligence, isn't it? Negligence is not the law. I'm not arguing for negligence. All right. What I'm arguing for is look at the record of this case and ask yourself, if this treatment had occurred at a county hospital, and I was here today representing the son or daughter of a lawyer or doctor in this community who was treated at a county hospital and hired me to file a 1983 action against a county hospital under these facts, that's the same way this case ought to be analyzed. That's not true. That's not true because there is a different standard for prison care. Deliberate indifference is going to be the standard under 1983. Right. That's different than if you were at a county hospital and a doctor was negligent. No. I can sue the county under Section 1983, and I'm still facing the higher burden of deliberate indifference. We know it's something less than reckless malicious. We know it's more than mere negligence, and the rest of it is sort of up for grabs. Section 1983 in a prison context requires an Eighth Amendment violation, right? That's correct. And if you were in a regular county hospital. I would argue due process. Exactly. Yeah, I would argue due process. But in the end, if you look at the case law, if you read the cases, and I know you have more than I, my conclusion is that what we end up with is under, for medical care cases, we are ending up with a standard, irrespective of where it occurs, of something more than negligence, less than reckless, or intentional. Well, why don't we just stick with the cases? Because we have cases that deal in the prison environment. Right. So why don't we tailor our discussion to those cases? Fine. That's fine. I think Farmer v. Brennan, I think McGuckin are both cases which talk about the issue of serious medical needs and how they must be met. If you fail to address a serious medical need that is manifesting, that is deliberate indifference. That's the standard. Failure to address is different than addressing it in a way that's less than ideal. Would you agree with that? No. No, I do not. I think that's a false dichotomy. I think it's the exact same thing. It's ways of looking at treatment that say, look, the doctor knows you're a diabetic, for example, and you don't get your insulin. That's a failure to address. What if the doctor withholds the insulin? Failure to give it. Okay. What if the doctor fails to take your vital signs to find out what the effect of that failure is on you in particular because it's going to vary across the population of diabetics? I think the issue is whether or not you're getting closer to a difference of opinion in terms of a treatment or whether you're totally failing to address the medical need. But that's not the basis of Judge King's decision below. Judge King's decision was not about a difference of medical treatment. Judge King's decision below on the issue of this doctor's deliberate indifference was whether or not she personally intended that the drug interactions that kill this person would occur. It's a specific intent standard that's inconsistent with Hope v. Pelzer, Saucier v. Katz, and this Court's recent decisions in Lee v. Gregory, Wall v. Orange County. That's not the law. You know what the problem is, though, in your argument, and you can tell me whether I'm wrong. Do we know what drugs were in this man on this record? On this record, we know of certain drugs that, if you read the declarations of Dr. Tackett and Dr. Victor, both talk about the lethal levels of Zoloft and Benadryl, the cross-potentiation of those drugs, meaning that the drugs enhance the effect on each other and the risks that are inherent from those in terms of the patient's respiration, and cardiac arrhythmia. Cardiac arrhythmia, as both doctors testify, as a cause of death in a Parkinson's white patient, will not show up on an autopsy, and that's why you cannot tell from the autopsy whether or not the cardiac arrhythmia was present or not at the time of death. What we do know about the cardiac arrhythmia is that this doctor never bothered to check the patient's heart rate, even though she was aware of the effects of these drugs, and that he was a Wolf Parkinson's white patient. Now, at the time this patient died, he was in extreme distress. The doctor's real failure in this case was not only her medicine, but her bias from the very beginning this patient came into her care, that he was a drug-seeking malingerer. And even on the 23rd, if you read the record of her notes, she says that he's willing to switch his medication. He's trying to get back into the medical unit, and because I've let him into Module 1, he's going to switch to the Trolophan again. Is that consistent with the fact that he was stabilized at some point? If you read Tony Williams' sworn statement, he states, completely contrary to Dr. Chung's assessment, that at the time he was moved from Module 4 to Module 1, King Toguchi could barely walk. He was shaking so badly he couldn't hold a cup of coffee. He was foaming at the mouth. His jaw was clenching. But before, is that in the record? At the time that the doctor says that Mr. Toguchi was stabilized, you're saying there's evidence in the record saying that he was not stable? Right. That is Tony Williams. So that's December 16th. No, at the time that he was moved, in the time period when he was in Module 4. But that's not the question I asked you. The question I asked you was regarding the December 16th statement that Mr. Toguchi was stabilized and released into the general public. Now, I understand your question. I do not have evidence to refute the point of discharge that at that time he was stable. But what I have is Tony Williams' statement saying, when I saw the man in Module 4, he was foaming at the mouth. His jaw was clenching. They have little foam mattresses that he couldn't even carry from Module 4 to Module 1. That was after he was returned to the general public. Exactly. Now, the reason those things are important, and I want to just, you know, the 3,000-pound elephant in the middle of the room is the contraband issue. How does that vector into this analysis? I think it vectors in two ways. Dr. Marvin, the defendant's own expert, conceded that in a prison environment, when you're treating prisoners, you have to consider contraband. Secondly, you know that this is not any ordinary prisoner. This is a prisoner with a 20-year history of serious mental health problems. If Hawaii had a forensic site prison, he probably would be alive today, but they don't. And instead, he got put into general population with a doctor who says, I didn't think of contraband. I never considered that as an issue. Even if contraband killed him, Dr. Marvin says, this is something a prison doctor must consider. Isn't that a difference of opinion, though, whether or not one should consider contraband in administering treatment to a prisoner? I think it's their expert saying it. It's not a difference of opinion. It's a difference of opinion between the expert and the treating doctor. Well, I ask you, don't the results of this case show that that's true? If, for example, what Judge King assumed but was never proved by anyone, that there was contraband involved, doesn't it prove that that's the case? I don't think this is about contraband. I think what it's about is a doctor who failed to realize the cost potentiation of these drugs because if you read Dr. Tackett's declaration and compare it with what Dr. Chung says, they both agree that for the levels of sertraline that this man had in his blood at the time he died, he would have had to taken 100 pills. Assuming that was the peak blood level that they measured and not something that had dropped off, Dr. Tackett says, and it's uncontradicted, there would have been residue of these pills in his stomach, and there was none. The only thing that can account for it, then, is the fact that he's being given drugs that are interacting with each other and contributing to the side effects that he's experiencing.  Counsel, what do you do with this language that we recently stated in Gibson v. County of Washoe, 2002 opinion? A prison official asks with deliberate indifference only if the prison official knows of and disregards an excessive risk to inmate health and safety. If a prison official should have been aware of the risk but was not, then the official has not violated the Eighth Amendment no matter how severe the risk. What do you do with that language? Well, I have to believe that what it means is this, that you don't gain immunity through ignorance, because if that's where we're going, we're going to end up with a system that is managed incompetently in ways that are inconsistent with the Constitution. Isn't that what we said, though, in Gibson? I'm going to get to the answer, Your Honor. The point is this. What that means is you can't have a doctor that's ignorant of basic medical facts, such as when you switch a prisoner from a Trillofan to Seroquel, you can expect hallucinations if you don't bring the blood level up of Seroquel before tapering off. Isn't that should have been aware of the risk but was not? I'm sorry? Wouldn't that be a circumstance where the doctor should have been aware of the risk but was not? Well, why have a doctor in prison in the first place if they're not there to provide competent medical care? I can't – if I accept your premise. It's not my premise. That's what the case says. I understand. The case says for a constitutional violation. Right. But what they also said in Gibson was that if there had been knowledge of the prisoner's condition, which was really the crux of the matter in Gibson, then qualified immunity would not have applied. But because the people who were dealing with Gibson at the time didn't know of his condition, they were not charged with the resulting death. Gibson wasn't being treated for a month by a prison doctor who knew the prisoner, who had prior medical history. This doctor cannot say with a straight face that she doesn't know this prisoner, doesn't know his medical history, doesn't know the conditions that he's suffering from, doesn't know the effects of these drugs. She knew he was hospitalized previously and admits that she got his chart right the day after he came in. His chart came over from the other correctional facility. She knew he'd been hospitalized with toxic psychosis and arrhythmia related to cogentin. Her response to that was, well, I disagree with the diagnosis of Dr. Wallach over at Queens Hospital who had to treat the man. I don't think that's sufficient. I don't think you can say that they can ignore medical fact. If what Gibson stands for is that a doctor treating a prisoner can establish medical facts that are set out in detail, not only in our experts' declarations, but which are corroborated by Dr. Snodgrass, defendant's expert and doctor. Wasn't Mr. Taguchi given cogentin twice a day while he was under Dr. Chung's care previously with no ill effects? Dr. Wallach testified in his deposition that this was not a patient who should be given cogentin. Would you answer my question, please? Wasn't Mr. Taguchi given cogentin twice a day while he was under Dr. Chung's care in 1997 with no ill effects? He ended up in the hospital as a result of the cogentin. That was in 1995. That is correct. I'm talking about 1997. That is correct. That's her assertion, that it was given to him with no ill effects at that time. So then why should she be charged with deliberate indifference regarding the cogentin? I don't understand your argument. My argument is the man was hospitalized and almost died once with a diagnosis of having had cogentin. She got away with giving it to him once again. Why should that be? I guess my question in response would be why should she be entitled to give a drug that she knows caused toxic psychosis and required hospitalization to a prisoner again, and we can say under the Eighth Amendment that's okay? Why can a doctor ignore established medical protocols and treatment? Why can a doctor leave him unattended for 45 minutes while he's dying? How do you know from this record she left him unattended? She says when she was there, but she was saying he was being monitored. Her deposition? If you could answer the question before I ask it, you would know. I'm so sorry. Judge Ferris, I'm so sorry. This is a case that's very important. She indicated when she saw him, but the record shows that he was being monitored every 15 minutes. That's not – go ahead. I'm sorry. No, go ahead. Judge Ferris, I really apologize. It doesn't offend me. Just assume we want to discuss this case because we have questions we have to resolve. If you don't want to hear the questions, I don't want to ask them. I'm very sorry. It was rude of me. I'd like to hear your entire question. I don't mind rudeness. After all these years, I've seen it before. Now, what I'm saying to you is the record shows – I understand your argument that she left him for 45 minutes, but the record doesn't say she was monitoring every 15 minutes. It says he was being monitored every 15 minutes. Now, do you think that means the doctor personally must be monitoring him or somebody else can do it? I think that if you look at the sheet – I mean, you can guess. I must have looked. I'm not referring to notes when I ask you this question. If you look at the excerpts, Judge Ferris, in the record, there is a monitoring sheet that the policy and procedures require show that when the monitoring occurs at 15-minute intervals. And there's a reason for that. Because if you don't document – it's like any other medical case. If you don't document it, it didn't happen. Now, we can have testimony after the fact that – oh, by declaration saying, oh, yes, you know, we went down and we monitored. But that document speaks for itself. And it's at the time of Dr. Chung's deposition, before the motions were filed, and at a time before she got to file and the other witnesses filed corrective statements, she said the nurses were changing rounds at 2 o'clock. And this is why I think no one saw him for that 45 minutes. Now, she did say, but after that 45 minutes, he was observed breathing at 2.45. And that's correct. But that document, in and of itself, says that there was nobody checking in. Was that a nurse's document or a doctor's document? Excuse me? The document. Who was responsible for completing that document? The nurse or the doctor? Well, Judge Ferris asked – But I'm asking you, who was responsible for completing that document? The person who was doing the monitoring, and that was probably the nurse in this particular case. My point about Dr. Chung is, if you're saying that she can step back from this prisoner at a time when he's in crisis and go chart and not pay attention to what's happening, given the behaviors that she's described, phantom behaviors of smoking, calling out for people who are not there, something seriously wrong. She actually testified that she checked him every 15 minutes. Well, why didn't she check the chart? She said she did not say that. She said it in her deposition before she gave that declaration. She said, I was charting for 45 minutes. I don't know who was watching him. And when I showed her the chart, she said, where did you get this document? It's the first time I've seen it. And when she looked at the chart, she said, it must have been because of the shift change. There was nobody there. Nurse Chung was in talking to me. That's what her deposition says. I'm sure I don't have to tell the court that she can't change her deposition testimony with a subsequent affidavit, and her witnesses can't come to her rescue when she's made a statement like that, especially when there's a corroborating document that shows very clearly that those 15-minute intervals were not met. That was not a time when Mr. Taguchi was resting comfortably. It was a time when he was dying. That wasn't a medical chart. That was a restraint form. Right. The restraint form has a medical component, as Dr. Marvick corroborates, when he testified that the reason that we monitor every 15 minutes when prisoners are in restraint is because of the possibility of arrhythmias and asphyxiation. And without those 15-minute intervals, a person can die a healthy person in those restraints because they're face down on the cement slab. Thank you. You've used your time. We'll give you a minute for rebuttal. Again, I'm very sorry. I don't get the other minute. I was just trying to anticipate your question and use my time as best I could. Good morning, Your Honors. While the death of Mr. Taguchi is a tragic one, the reality here is that Mr. Taguchi essentially died from an apparent overdose inflicted by his own means. The plaintiffs, nevertheless, are not only trying to place the blame on Dr. Chung, but are trying to claim that she deliberately subjected Mr. Taguchi to an excessive risk that caused his death. As unthinkable as this allegation is, given the undisputed attention and concern that Dr. Chung paid to Mr. Taguchi's plight, the Supreme Court's holding in Farmer v. Brand makes very clear that plaintiffs must establish this serious allegation and must show that she knew, in fact, knew that her actions exposed him to a substantial risk of serious harm. It is not enough that she should have known. I mean, plaintiffs point out the weakness of their case by repeatedly asserting, even just now, that she did not, that she detested whether she knew or should have known. The should have known part is clearly in violation of the Farmer standard, which requires that Dr. Chung actually know and be aware of the fact that her actions were exposing Mr. Taguchi to a substantial risk of serious harm. Counsel, what about opposing counsel's argument that a physician can just profess total ignorance and just go in and blindly make decisions without giving any thought and then claim qualified immunity? What's your response to that? The problem here is that there's no evidence that that was the case. In this case, what we have is a situation where all the evidence shows that Dr. Chung made valiant efforts to control Mr. Taguchi's problems. She saw his problems. She observed them. She diagnosed them. And she prescribed drugs and prescribed proper treatment or prescribed treatment. She observed that her treatment was working and then went on that basis. When things changed, she changed. She went ahead and diagnosed the situation, applied her best efforts to diagnose the situation and come up with a solution and an approach to her treatment. The fact that some doctor experts on their side can, after the fact, look at it and say, well, I would have done it differently doesn't change the fact that she subjectively believed in her own mind that what she was doing was proper. This is not a situation where a doctor looks at some serious problem and lies back and goes, well, gee, isn't that too bad and does nothing. His argument isn't that she subjectively knew. His argument is she assumed and on the basis of her assumptions she blocked out what she could have known. Her assumptions were based on her own experience. Her main assumption, her main conclusion was that this Mr. Taguchi was suffering from methamphetamine withdrawal. And she based that on her own experience, her extensive experience with methamphetamine drug withdrawal symptoms and prior users. So she looked at the situation and based on her knowledge she made her conclusion. She rejected all, many of the other things that some of the plaintiff's experts suggest was the real problem. And she gives record sites. If you look at her own declarations in our Supplemental Excerpt to Record 23 and Supplemental Excerpt to Record 77, they give full explanations as to why she disagreed with the plaintiff's experts in terms of prescribing cogentin, in terms of prescribing Benadryl and cogentin and taking them off clonopin. She gives her own reasons. And the point is whether or not you choose to believe her version or their version, the fact remains that at most you have a disagreement with her analysis. But what you don't have a disagreement with or what you have no dispute about is the fact that she made these determinations based on her own medical judgment, which was informed medical judgment, and she made those determinations whether right or wrong. She believed them and she believed them to be the right decision. And this Court cannot attack those decisions except to say perhaps maybe she was negligent. But, again, it's all ñ it's very clear that negligence does not rise to the level of deliberative evidence. What about the failure to monitor Mr. Taguchi while he was in restraints? The fact is, is that the evidence is uncontradicted that she was monitored every 15 minutes. Dr. Chung, in her deposition, clearly states that she was ñ that she went back every 15 minutes after having him in restraints and prescribing the Benadryl. She went back. She states clearly, repeatedly in her deposition as well as in her declaration, that she was monitored every 15 minutes. What deposition testimony, then, is opposing counsel referring to when he says that in her deposition she talked about the lack of monitoring? But I believe what he's referring to is the fact that the chart, which is checked off by the nurses, showed a gap in monitoring between 1.45 and 2.30 p.m. But that just shows a gap in terms of the nurses' monitoring. There's no contradiction in the fact that Dr. Chung herself monitored during that entire period of time. So there really is no contradiction here. We only simply have a point that the nurses might not have monitored during that 45-minute period of time. More so, even during that 45-minute period of time, nothing significant happened because Mr. Chung or Dr. ñ I mean, Mr. Taguchi was found to be observed not breathing at the 3 o'clock check. There had been two prior checks by nurses at 2.30 and 2.45. So even if there were some evidence that there was no one checking, that not ñ that that lack of checking had nothing to do with any cause of harm to Mr. Taguchi because he died subsequent, about a half an hour after the other checks had already been performed. So there's no causal connection in any event. But, again, the main point is that there, in fact, was checking by her every 15 minutes, and the record is uncontradicted as to that point. Same with the issue of Kogentian, where he says that Kogentian was prescribed, as Judge Rawlinson accurately noted. She noted very clearly that Kogentian had actually been prescribed to him on many other occasions, and he had reacted positively to it. In fact, she states in her declaration on page 9 of the Supplemental Exceptional Record 77 that Mr. Taguchi was paroled because he had been stabilized on Kogentian and that he tolerated these well and without incident. I, therefore, had no medical reason to think he was suffering any Kogentian toxic psychosis in December 1998. So, again, we have a situation here where all the evidence that plaintiff puts forth at most and we have evidence from our doctors suggesting that everything she did was actually proper, but at most plaintiffs have raised an issue of medical malpractice. They have nothing to contradict the undisputed statements by Dr. Chung that she knowingly believed that or she believed in her own mind that everything she did was beneficial and helpful to Mr. Taguchi and that had she known or ever thought that Mr. Taguchi was in any harm because of her treatment, she would have acted differently. How long had Dr. Chung been a prison doctor? I believe, I have to check that. I know she was a psychiatrist for over 20-some years. I'm not exactly sure the exact period of time that she was in the prison. I know that she had been treating Mr. Taguchi prior to him being paroled, so she had been in the prison for at least a few years. I can't tell you right offhand the exact number of years she was in the prison. What is your response to opposing counsel's argument that it was unreasonable for her not to have considered contraband in treating a prisoner? Yes, she states very clearly in her declaration why she had ruled that out. She states in supplemental excerpt of Record No. 77, at paragraph 49, she said, quote, I did not consider that he had taken such contraband as illicit drugs when I arrived at my impressions during December 1998. This was not my first consideration because Mr. Taguchi had been hospitalized in the infirmary 24 hours a day for the first two weeks of his reincarceration and also had been under close supervision in the so-called mental health module from December 21st through December 23rd. So this is her explanation. Now, even if one were to disregard her explanation and say, well, I wouldn't have – I still would have considered contraband. At most, again, you would have a suggestion that maybe she was negligent in not considering it. We wouldn't have a situation where she was consciously – that she consciously was aware of that risk and disregarded it. At most, you would have a question of she – wasn't she negligent? Shouldn't she have considered it? This is not a case where if a prison inmate had come to Dr. Chu and said, you know what, I saw Mr. Taguchi taking something in his hands and swallowing it. In that case, if Mr. – Dr. Chu had just simply ignored the situation, one can say, well, she must have known there was a risk of him taking contraband. We don't have that situation at all here. She believed – and she states very clearly that she believed in her own mind that that was not the issue. She did not believe that contraband was an issue. And she gives her explanation as to why it was not. And Mr. Varity also claims that Dr. Chu, quote, failed to realize the cross-potentiation of these drugs. The first point is if we even were to take Mr. Varity's statement at face value, his own statement contradicts his case, because if she in fact failed to realize the cross-potentiation, then at most she's negligent, but she clearly did not consciously subject him to these drugs and know that these were posing a risk. So his own statements – and throughout the lower court, as well as on appeal, he repeatedly makes statements that basically say she didn't realize what she was doing. If that's true, then she's definitely not deliberately indifferent. At most she would be negligent. In this case, however, she explains why she didn't consider cross-potentiation. She said that given the amount of drugs that she had prescribed, that there was simply no serious risk. Now, experts could choose to disagree with her, but there again we have merely a question of negligence being raised. We don't have any issue whatsoever of her knowingly subjecting him to a drug risk that she consciously was aware would subject him to a substantial risk of serious harm. And regardless of the ultimate cause of death in this case, we simply have no evidence here that any possible cause of his death was one that she, in her own perceptions, thought was going to be a cause or contribute to his death. There's nothing throughout the record in this case that would ever suggest that she knew or appreciated any particular risk and then disregarded that risk or acted in a way that she knowingly subjected him to a serious risk of substantial harm. I have nothing further to say. Any questions? Thank you, counsel. Thank you. We'll give you a couple of minutes for rebuttal. First of all, your question about Gibson, I wanted to go back to the brief. And in the opening brief, we discussed Gibson on page 24 of the brief. And what the court says there is because we have determined there is no proof that the deputies in the jail were aware that Gibson's behavior was connected to his treatable mental illness, we cannot hold them accountable for having treated Gibson as a dangerous prisoner rather than a sick one. On the other hand, Dr. Chung can't claim that ignorance because she knows of Mr. Toguchi's conditions, and she knows about the drugs she's giving him, and she knows about the potential risks and benefits of those drugs. She assumes throughout her course of treatment that this man is a drug-stinking malingerer who wants to get out of general population and into the medical unit. Those assumptions killed him. And she is not in a position of the deputies in Gibson to be able to say, oh, I didn't know. Judge King looked down at the defense counsel at the summary judgment motion and said, well, no. And he's a great judge, by the way. I don't mean to malign him in any way. But he said very carefully, this is individual liability. And that's really troubling to him, and I'm sure it's troubling to this court. But it's a standard that if the court is willing to give defendants the standard they're asking for, it's a tremendously... I don't think the court is reluctant to impose individual liability or deny qualified immunity in appropriate cases. I think this is an appropriate case, Your Honor, and the reason for that is that this doctor had all the information available to her necessary to treat this patient with simple things, to take a blood urine test, as Dr. Barber suggested, to take a pulse rate, to make sure that the nurses were, in fact, doing their jobs. If you look at excerpts of Record 51, it's where the discussion occurs regarding the failure of the nurses, and Nurse Chun in particular, to check off and observe and indicate that she'd observed the respiration of Mr. Taguchi. That's ER 51. That's an excerpt from Dr. Chun's deposition testimony. A couple points I was unable to address in my opening comments were the parental claims are never treated by the court below. Judge King just did not address them. He glossed over them. And I know that defendants argue that they're derivative claims and that you'd have to prove an Eighth Amendment violation. I don't think that's what this court's decisions say. What case are you relying upon to say that the parents have an independent claim? There are three cases. What's your best one? I'll give you my best one now. There's Lee v. City of Los Angeles, Your Honor. And what language are you relying upon in Lee v. City of Los Angeles? I will have to grab my notes. All right. In Lee, the court says it's well established that a parent has a fundamental liberty interest in the companionship and society of his or her child. Minor child or adult child? It's recognized both ways because the cases of Smith v. Fontana recognize the action in both minor and adult children in the relationship to their deceased father. Morrison v. Jones. Wait a minute. Wait. Smith v. Fontana was a relationship of a child to a father. I'm talking about a case where the adult child dies and the parental rights are recognized. What's your best case authority for that proposition? The separation of an adult child after a two-step operation due to misidentification as a fugitive felon. That's Lee v. City of Los Angeles. Okay. So that's your best case. Right. That's an adult, mentally retarded man, I believe, or had some disability who was misidentified as a fugitive felon. Which is probably analogous to a child. But we'll look at your cases. The other point I wanted to make, Your Honor, in addressing Judge Noonan and I think also Judge Rollins, you both asked me a similar question on, well, the prisoner got some treatment. Isn't that enough? And I think Wood v. Son, which is another case out of the circuit and, in fact, originated in Hawaii, where a prisoner for a long period of time was misdiagnosed and given the wrong care, did not die, but the court still recognized in that case. Just because you get some medical care is insufficient. You have to provide care that is effective. And in this case, it was a prisoner who needed a hernia operation and went through, not years, but months of remains. Do you mean to say treatment that is effective, a treatment that meets a certain standard? Well, I guess my question would be, if the treatment makes the prisoner's care worse, would that meet the constitutional requirement? And I think the answer to that is no because that would mean that the physician has failed to recognize the serious medical needs of the prisoner. In order to recognize the serious medical need, this is why I think Dr. Victor really hits it on the head when he says the basic baseline measurements for assessing where this prisoner was were never taken. How can you provide treatment for serious medical needs or assess serious medical needs if you don't know where the prison is? The first thing you do, Judge Ferris, when you go to the doctors, you know, he takes your vital signs, what your weight is, what's going on with you. And he doesn't do anything until, or she doesn't do anything, until that information is before him or her. That did not occur in this case. What happened was a series of assumptions, misapplications of medication in the case of the Trilofan and the Seroquel that you pointed out, denial of the Klonopin, which you also pointed out, which would have an effect on the cardiac rhythms of this particular prisoner, none of which, the effects of which were never addressed. Dr. Chung can be the best-hearted person in the world, but with this kind of analysis going, she's not addressing the prisoner's serious medical needs because she doesn't know what those needs are. She said, I guessed, that's what they were. That's not enough to meet what the law requires. And I think what your cases have said, what this Court's cases have said throughout the history of qualified immunity analysis is you must meet those serious needs in order to be sure. All right, counsel, we understand your argument. Thank you very much. Thank you to both counsel. The case just argued is submitted for decision, and that is the last case on calendar. This session of the Court is in recess.
judges: Silverman, W. Fletcher, Rawlinson